

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JANICE KONKOL, On Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>DIEBOLD INC., WALDEN W. O'DELL, MICHAEL J. HILLOCK, DAVID BUCCI, KEVIN J. KRAKORA, THOMAS W. SWIDARSKI, ERIC C. EVANS, ROBERT UROSEVICH, GREGORY T. GESWEIN, AND JOHN M. CROWTHER,<br><br>Defendants. | CASE NUMBER 5:05CV2873<br><br>JUDGE: **JUDGE ECONOMUS**<br><br><u>JURY TRIAL DEMANDED</u><br><br>MAG. JUDGE LIMBERT |

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff, Janice Konkol, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings by Diebold Inc. ("Diebold" or the "Company") and media reports about the Company.

## NATURE OF THE CASE

1. This is a securities class action on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired Diebold securities (the "Class") during the period October 22, 2003 through September 21, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2. Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5.

3. Venue is proper in this District pursuant to §27 of the 1934 Act. The corporate headquarters of Diebold are located in the District.

4. In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

5. Plaintiff Janice Konkol, as set forth in the accompanying certification (attached as Exhibit A), incorporated by reference herein, purchased shares of Diebold stock at artificially inflated prices during the Class Period as described in the attached certification, and was damaged thereby.

6. Defendant Diebold engages in the development, manufacture, sale, and service of self-service transaction systems, electronic and physical security systems, software, and various products used to equip bank facilities and electronic voting terminals principally in the United States. The principal offices of the Company are located at 5995 Mayfair Road, North Canton, Ohio.

7. Defendant Walden W. O'Dell ("O'Dell") was Chairman of the Board and Chief Executive Officer of Diebold.

8. Defendant Michael J. Hillock ("Hillock") was President of International Operations at Diebold.

9. Defendant David Bucci ("Bucci") was Senior Vice President of Customer Solutions at Diebold.

10. Defendant Robert Urosevich ("Urosevich") was President of Diebold Election Systems, Inc., a wholly owned subsidiary of Diebold.

11. Defendant Kevin J. Krakora ("Krakora") was Interim Chief Financial Officer, Principal Accounting Officer and Controller of Diebold.

12. Defendant John M. Crowther ("Crowther") was Vice President and Chief Information Officer at Diebold.

13. Defendant Thomas W. Swidarski ("Swidarski") was Senior Vice President of the Financial Self-Service Group at Diebold.

14. Defendant Eric C. Evans ("Evans") was President and Chief Operating Officer at Diebold.

15. Defendant Gregory T. Geswein ("Geswein") was Senior Vice President and Chief Financial Officer at Diebold.

16. The individuals named as defendants in ¶¶7-15 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Diebold quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance, or cause them to be corrected. Because of their positions and access to material non-public information, available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

17. In addition to the above-described involvement, each Individual Defendant had knowledge of Diebold's problems. Each defendant was motivated to conceal such problems. Defendants Krakora and Geswein, each having served as CFO, provided for financial reporting and communications with the market. Communications with the market, including conference calls, as well as internal reports showing Diebold's forecasted and actual growth were prepared under their direction. Defendants O'Dell, Evans and Swidarski also provided for communications with the market, including conference calls, as well as reports on Company operations, financing and press releases issued by the Company. Defendant Urosevich, as President of Diebold Election Systems and defendants Hillock, Bucci and Crowther, as operational Vice Presidents each had joint responsibility for financial reporting and communications for their respective divisions. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. Each Individual Defendant also owed a duty to the Company and its shareholders not to trade on inside information.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

18. Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about Diebold. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Diebold publicly traded securities was a success, as it (a) deceived the investing public regarding Diebold's prospects and business; (b) artificially inflated the prices of Diebold's publicly traded securities; (c) allowed insiders to sell over 51,000 shares of Diebold stock, for proceeds of $2.7 million; and (d) caused plaintiff and other members of the Class to purchase Diebold's publicly traded securities at inflated prices.

19. On December 10, 2003, the Company issued a press release entitled, "San Diego County Finalizes Contract With Diebold Election Systems." The press release stated in part:

> Diebold Election Systems, Inc., a subsidiary of Diebold, Incorporated, has finalized its contract agreement with San Diego County, Calif., to provide approximately 10,000 touch-screen voting systems and supporting services for the jurisdiction *The contract is valued at about $28 million, approximately $22 million of which will be recognized by Diebold as fourth quarter revenue. The decision was made official by a unanimous vote during a meeting held by the San Diego County Board of Supervisors.*
>
> "We are very pleased with San Diego County's vote of confidence in choosing our touch-screen voting system to meet its election needs," said Robert J. Urosevich, president of Diebold Election Systems. "We look forward to fully supporting San Diego as the process to implement its voting systems moves forward."

20. On November 10, 2004, defendants issued a press release entitled, "Diebold Reaches Settlement Agreement With State Of California". The press release stated in part:

> Diebold, Incorporated today announced it has reached a settlement agreement with the State of California in its civil action against Diebold Election Systems, Inc., a wholly owned subsidiary. Terms of the settlement consist of a total $2.6 million payment to the state, which includes $500,000 to help form a voter education and poll worker training program in California coordinated through the University of California Institute of Governmental Studies. Additionally, Diebold has agreed to certain technology and

reporting obligations that will provide election officials with a better understanding of the most effective manner of implementing its elections systems.

Costs related to this civil action, including the $2.6 million reserve for the settlement payment and costs related to product recertification, legal and other expenses, were included in the company's third quarter results. As previously disclosed, these costs had a $0.05 impact on earnings in the third quarter. Also, the company previously disclosed it anticipates an additional $0.01 per share of expense in the fourth quarter related to resolving this matter.

"We've worked closely with California officials to come to an agreement that allows us to continue to move forward in providing California and its residents with outstanding election systems," said Thomas W. Swidarski, senior vice president, strategic development and global marketing for Diebold, Incorporated, who directly oversees the Diebold Election Systems subsidiary. ***"While we believe Diebold has strong responses to the claims raised in the suit, we are primarily interested in building an effective and trusting relationship with California election officials so that we can work together in building election solutions that address the State's needs. Avoiding the distraction and cost of prolonged litigation will assist us in meeting those goals. The excellent performance of our solutions on Election Day is a great example of our ability to provide safe, accurate and reliable voting technology to the residents of California."***

On Election Day in California, Alameda and Plumas counties used the Diebold AccuVote-TS solution to provide their electorate, totaling more than 690,000 registered voters, with a secure, accurate and accessible election system. Also, Los Angeles County, the largest county in the United States, used the AccuVote-TS system for early voting, with each voting station having the ability to present to each voter one of more than 800 ballot styles in seven different languages. Parallel monitoring conducted during the presidential election in California found the AccuVote-TS recorded votes with 100 percent accuracy, as they did during the March primary election. Also, voters in Georgia, Maryland, Kansas, Virginia and elsewhere throughout the country successfully used Diebold touch screen voting systems to accurately and securely cast their ballots on Election Day.

21. On September 21, 2005, defendants issued a press release entitled, "Diebold Reduces 2005 Third Quarter and Year-End Earnings Outlook - North America revenue outlook below previous expectations: investor conference call scheduled for today at 10:00 a.m. ET". The press release stated in part:

Diebold. Incorporated (NYSE: DBD - News) today announced it is lowering its third quarter and full-year earnings per share guidance for 2005.

The company now anticipates third quarter EPS in the range of $.32 to $.37, which includes restructuring charges of approximately $.07 per share related to the continued realignment of its operations, manufacturing start-up and other one-time costs of approximately $.04 per share, and the one-time gain of approximately $.18 per share on the sale of the campus card systems business. Excluding these items. EPS is expected to be in the range of $.25 to $.30*.

*Full-year EPS is now expected to be $1.90 to $2.00\*. This range excludes restructuring charges of approximately $.30 per share, manufacturing start-up costs and other one-time costs of approximately $.08 per share, and the one-time gain of approximately $.18 per share on the sale of the campus card systems business. This revised earnings guidance compares to 2004 full-year earnings per share of $2.53.*

Factors contributing to the lowered earnings expectations are:

*- Overall North America financial self-service revenue outlook is lower than previously expected, resulting in lower profit expectations.*

- Certain revenue anticipated from the company's North America business for the third quarter is being pushed out to future periods. partially impacted by the effect of Hurricane Katrina.

*- Operational inefficiencies, rising fuel costs and pricing pressures are continuing to negatively impact gross margins.*

- Higher effective tax rate of approximately 34 percent for the year.

*"I am extremely disappointed with our lack of progress in correcting our operational inefficiencies, and I am personally committed to taking immediate action to improve our effectiveness in these areas," said Walden W. O'Dell, Diebold chairman and chief executive officer. "We are evaluating further restructuring and other actions to improve our performance and competitiveness beyond the current restructuring guidance. We will have more to report on all these efforts during the coming months."*

Total financial self-service revenue is expected to be more than $50 million lower during the current quarter compared to previous expectations, with most of the shortfall occurring in North America as the company experiences continued market weakness in the more profitable regional bank segment. This segment represents the majority of Diebold's North America automated teller machine-related sales, with half of the company's global financial

self-service revenue derived from North America. The lowered revenue expectations are also a result of customer delays and operational inefficiencies that were compounded by Hurricane Katrina, which affected scheduled ATM deliveries, security installations, service maintenance contracts and other near-term business throughout the Gulf region.

Additionally, the impact of Hurricane Katrina is negatively affecting scheduled election systems deliveries in the Gulf region, resulting in approximately $10 million in lower elections systems revenue during the quarter. While management is still quantifying the overall impact of Hurricane Katrina, the company anticipates overcoming some of the shortfall caused by the hurricane in future periods as the affected regions begin to rebuild.

Also, fuel prices have increased dramatically, resulting in significantly higher costs in freight and service fleet operations. The company is taking steps to overcome this continuing issue, including instituting a fuel surcharge on certain services.

"We continue to be adversely affected by significantly unfavorable geographic revenue mix as the North America market for ATMs has weakened, particularly among regional banks," added O'Dell. "In addition, we are experiencing global supply chain and manufacturing inefficiencies and rising commodity costs, which were exacerbated by Hurricane Katrina. In response, we are instituting price increases in appropriate areas. Despite the recent weakness in the North America ATM market, we remain confident that the markets we serve remain healthy, and the actions we are taking will better position us for 2006 and beyond."

22. On the news of September 21, 2005, the price of Diebold shares plunged 15.5%, on unusually high volume, falling from $44.37 per share on September 20, 2005 to $37.47 per share on September 21, 2005, for a one-day drop of $6.90 per share, on volume of 6.1 million shares, nearly eight times the average daily trading volume.

23. During the Class Period, defendants knew and concealed that:

(a) The Company remained unable to assure the quality and working order of their voting machine products;

(b) The Company lacked a credible state of internal controls and corporate compliance;

(c) The 2004 settlement with the State of California served to conceal from investors the dimensions and scope of internal problems at the Company, impacting product quality, strategic planning, forecasting, guidance, internal controls and corporate compliance; and

(d) The Company's "prediction" of astonishingly low and incredibly inaccurate restructuring charges for the entire 2005 fiscal year grossly understated the true costs defendants faced to restructure the Company.

**DEFENDANTS' CLASS PERIOD STOCK SALES**

24. During the Class Period, the following defendants sold their shares in accordance with the following schedule:

| Date | Defendant | Shares | Price | Proceeds |
|---|---|---|---|---|
| 2/9/2005 | BUCCI, DAVID | 406 | $55.57 | $22,561 |
| 2/9/2005 | BUCCI, DAVID | 993 | $54.87 | $54,486 |
| 2/9/2005 | BUCCI, DAVID | 985 | $55.57 | $54,736 |
| 11/15/2004 | BUCCI, DAVID | 518 | $53.82 | $27,878 |
| 11/15/2004 | BUCCI, DAVID | 630 | $53.82 | $33,906 |
| 9/27/2004 | BUCCI, DAVID | 5000 | $46.99 | $234,950 |
| 2/11/2004 | BUCCI, DAVID | 13200 | $53.00 | $699,600 |
| 1/13/2004 | BUCCI, DAVID | 5920 | $53.62 | $317,430 |
| | | | | |
| 2/11/2005 | CROWTHER, JOHN M. | 1997 | $54.65 | $109,136 |
| | | | | |
| 2/11/2005 | KRAKORA, KEVIN J. | 3225 | $54.65 | $176,246 |
| 2/11/2004 | KRAKORA, KEVIN J. | 689 | $53.00 | $36,517 |
| | | | | |
| 2/11/2005 | O'DELL, WALDEN W. | 10773 | $54.65 | $588,744 |
| | | | | |
| 2/11/2005 | SWIDARSKI, THOMAS W. | 5468 | $54.65 | $298,826 |
| 2/11/2004 | SWIDARSKI, THOMAS W. | 1987 | $53.00 | $105,311 |
| | | | | |
| | | 51791 | | $2,760,327 |

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Diebold publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants.

26. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Diebold had more than 70 million shares of stock outstanding, owned by hundreds if not thousands of persons.

27. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants:

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether the prices of Diebold's publicly traded securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

28. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

29. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

30. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

31. Plaintiff incorporates ¶¶1-30 by reference, as if fully rewritten herein.

32. During the Class Period, defendants disseminated, approved or deliberately disregarded the false statements specified above, which they knew or should have known were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

33. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

   (a) Employed devices, schemes, and artifices to defraud;

   (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or

   (c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection

with their purchases of Diebold publicly traded securities during the Class Period.

34. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Diebold publicly traded securities. Plaintiff and the Class would not have purchased Diebold publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

35. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Diebold publicly traded securities during the Class Period.

## COUNT II
### For Violation of §20(a) of the 1934 Act
### Against All Defendants

36. Plaintiff incorporates ¶¶1-35 by reference, as if fully rewritten herein.

37. The Individual Defendants acted as controlling persons of Diebold within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Diebold, and their ownership of Diebold stock, the Individual Defendants had the power and authority to cause Diebold to engage in the wrongful conduct complained of herein. Diebold controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Diebold are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to FRCP 23;

B. Awarding plaintiff and the members of the Class damages, interest and costs; and

C.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable

Dated:  December 13, 2005            Respectfully submitted,
        Chagrin Falls, Ohio

*[signature]*
Walter W. Noss  (#0072784)
Geoffrey M. Johnson  (#0073084)
SCOTT + SCOTT, LLC
33 River Street
Chagrin Falls, OH  44022
Telephone:  (440) 247-8200
Facsimile:  (440) 247-8275
Email:  wnoss@scott-scott.com
        gjohnson@scott-scott.com

David R. Scott
SCOTT + SCOTT, LLC
108 Norwich Avenue
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
Email:  drscott@scott-scott.com

Arthur L. Shingler III
SCOTT + SCOTT, LLC
600 B Street, Suite 1500
San Diego, CA  92101
Telephone:  (619) 233-4565
Facsimile:  (619) 233-0508
Email:  ashingler@scott-scott.com

*Attorneys for Plaintiff*