**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: DIEBOLD SECURITIES** | ) | **CASE NO.  5:05CV2873** |
| **LITIGATION** | ) | |
| | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| | ) | |
| | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |

This matter is before the Court upon Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint. (Dkt. # 58). Plaintiffs have filed a Response in Opposition, (Dkt. # 62), and Defendants have filed a Reply, (Dkt. # 65).

## I. INTRODUCTION

This is an action for securities fraud brought on behalf of shareholders of Defendant Diebold, Inc. ("Diebold"), against Diebold, as well as Walden O'Dell, Gregory Geswein, Thomas Swidarski, Kevin Krakora, Eric Evans, John Crowther, Robert Urosevich David Bucci, and Michael Hillock (the "Individual Defendants") (collectively, the "Defendants."). On April 27, 2007, Plaintiffs filed an Amended Complaint alleging violations of Section 10(b) of the Securities and Exchange Act of 1934, Section 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 on April 27, 2007. (Dkt. # 56). Plaintiffs claim that Defendants made a series of allegedly false statements regarding the financial health of Diebold and that those statements materially misled the investing public.

1

## A. The Parties

Diebold is an Ohio corporation. Its principal place of business is Akron, Ohio. Diebold manufactures, sells, installs and services automated teller machines, security products, election systems and software. (Dkt. # 60, Ex. A). Diebold is comprised of three components: Diebold North America, Diebold International, and Diebold Election Systems Inc. Diebold North America and Diebold International sell and service Diebold banking and security products domestically and abroad, respectively. Diebold Election Systems, a wholly-owned subsidiary, sells and services Diebold's voting products. As a public company, Diebold files periodic reports with the SEC. The Defendants are Diebold and several current and former members of the company's senior management.

Plaintiffs are purchasers of publicly traded stocks of Diebold during the period from October 22, 2003, to September 21, 2005, (the "Class Period"). The members of the Diebold Lead Plaintiff Group, consisting of the International Union of Operating Engineers Local 825 Pension Funds, Orchard Limited, Stephen W. Tilton, and Joe B. Young (collectively, the "Plaintiffs"), were appointed to serve as Lead Plaintiffs in October 2006. (Dkt. # 42). All Plaintiffs purchased Diebold common stock and securities during the Class Period. (Dkt. # 56 at ¶ 13).

## B. Specific Allegations

On September 21, 2005, Diebold lowered its earnings-per-share guidance for the third quarter and full year 2005, citing several factors: lower-than-expected revenue from the financial self-service business in North America, delays caused by Hurricane Katrina, operational inefficiencies, rising fuel costs, and pricing pressures. (Dkt. # 56 at ¶ 288).

2

Its stock price fell on the news of the lowered earnings-per-share guidance, and shortly thereafter several class action lawsuits were filed alleging violations of the federal securities laws.

Plaintiffs in the instant action allege three different schemes by which the Defendants manipulated their revenues: (1) recording of sales of uncertified voting machines to California and Ohio which they knew would never be accepted; (2) sale of ATM's and/or software that had never been ordered or "phony invoicing"; and (3) bundling of sales for post-delivery software services with the actual sale of the software. (Dkt. # 56 at ¶¶ 4,6,7).  Plaintiffs allege that these three schemes, in conjunction with the issuance of false financial statements, together reflect an overarching scheme to recognize revenue prematurely.  Plaintiffs assert that these schemes were fraudulent because the practices were in violation of the generally accepted accounting procedures ("GAAP"), as well as the accounting procedures published by the company itself.

### 1. Diebold Election Systems Contracts in California and Ohio

Between 2002 and 2004, Diebold Election Systems sold and delivered electronic voting machines to several counties in Ohio and California for upcoming elections.  (Dkt. # 56 at ¶¶ 41-42).  In 2004, a well- publicized dispute arose concerning whether some of those machines complied with certain certification requirements.  (Dkt. # 56 at ¶¶ 41-422).  The Complaint contends that Defendants knew those machines would not comply with applicable certification requirements.  (Dkt. # 56 at ¶¶ 41-60).

After initially announcing its second quarter 2005 earnings on July 27, 2005, Diebold discovered and announced that it had mistakenly included approximately $10.3 million of

revenue from those machines in the preliminary quarterly earnings announcement.  (Dkt. # 56 at ¶¶ 64, 252, 254, 256).  In response to this announcement, Defendant's stock dropped 12%.  (Dkt. # 56 at ¶ 264).  The Complaint contends that Defendants purposefully and prematurely included the $10.3 million in Diebold's preliminary announcement of second quarter earnings to prop up the stock price.  (Dkt. # 56 at ¶¶ 61-66).  The fact that a dispute arose between Diebold and its customers, according to Plaintiffs, indicates that it was improper for Diebold to have recognized revenue in the first place, at the time the machines were sold.  (Dkt. # 56 at ¶¶ 58-59).

### 2. ATM Machines

The Complaint's second prong relates to the service arm of Diebold North America.  (Dkt. # 56 at ¶¶ 67-90).  The Complaint contends that the Company sent fraudulent service invoices to customers in violation of contract requirements and booked phony service revenue based on those invoices.  (Dkt. # 56 at ¶ 68. 69, 72-75, 78-79, 81, 83).  Plaintiffs allege that the invoices were then sent out at the end of each quarter or fiscal year so that Diebold could make its earnings and revenue numbers.  (Dkt. # 56 at ¶ 68, 73, 75, 81, 82, 93).  Plaintiffs further allege that in the event that the phony invoice was caught by a customer, the invoice would not be canceled until after the end of the quarter to ensure that revenues were permanently inflated.  (Dkt. # 56 at ¶ 68, 75, 76).

### 3. Bundling of Software and Post-Delivery Services

The third prong of the Complaint alleges that Diebold bundled together software with hardware and/or post-delivery services in a single contract, in violation of GAAP. Plaintiffs contend that Defendants therefore prematurely recognized revenue when

4

Diebold recognized the full amount of revenue upon contract signing and/or delivery of the ATMs and voting machines. (Dkt. # 56 at ¶ 38, 91-94, 126).

## II. APPLICABLE PLEADING STANDARDS

### A. Rule 12(b)(6)

As with any motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint as true. Tellabs, Inc. v. Makor Issues & Rights, LTD., 127 S.Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007). When ruling on a Rule 12(b)(6) motion, the Court must also construe the complaint in a light most favorable to the nonmoving party. Bloch v. Ribar, 156 F.3d 673, 677 (6th Cir. 1998).

### B. Pleading Securities Fraud

As this is a securities action, the Court is required to apply a more vigorous standard of review. The Court must first view the allegations under Federal Rule 9(b)'s requirement that claims of fraud be plead with particularity. Fed. R. Civ. P. 9(b). Specifically, this rule states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Id. In order to satisfy this heightened requirement, a plaintiff must detail specifically the facts and circumstances it claims constitute the defendant's fraudulent conduct. Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 322 (6th Cir. 1999). In other words, the plaintiff must "allege the time, place, and content of the alleged misrepresentation," the fraudulent intent of the defendants, and the resulting injury. Id. Generalized and conclusory allegations that the defendant's conduct was fraudulent do

not satisfy Rule 9(b).   Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001).

Notwithstanding Rule 9(b)'s mandate that fraud must be plead with particularity, the Court must also apply the strictures of the Private Securities Litigation Reform Act ("PSLRA"), which requires that a plaintiff state with particularity all facts  supporting an allegation made on information and belief, as well as all facts establishing scienter. Section 78u-4(b) states, in relevant part:

> **(b) Requirements for securities fraud actions**
> **(1) Misleading statements and omissions**
> In any private action arising under this chapter in which the plaintiff alleges that the defendant
>
>> (A) made an untrue statement of a material fact; or
>>
>> (B) omitted to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> **(2) Required state of mind**
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.15 U.S.C. § 78u-4(b) (1)-(2).

Thus, Plaintiffs must set forth specific facts not only in support of allegations of falsity and fraud, but also to support allegations of the requisite state of mind.  In other

6

words, Plaintiffs must plead facts giving rise to a strong inference of scienter; complaints containing conclusory allegations are properly dismissed.  <u>Helwig v. Vencor</u>, <u>Inc</u>., 251 F.3d 540, 565 (6th Cir. 2001).  This does not change the fact that the Court is still required to draw inferences in favor of the plaintiff; however, the Court is required to accept plaintiff's inferences of scienter only if those inferences are the most plausible of competing inferences.  <u>Id</u>. at 553.

## III. LAW AND ANALYSIS

Section 10(b) of the Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Under Rule 10b-5, it is illegal for one "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ."  17 C.F.R. § 240.10b-5.

To establish a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege the following in connection with the purchase or sale of securities: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) justifiably relied on by the plaintiff; and (5) proximately causing their injury.  <u>See</u> <u>e.g.</u>, <u>Helwig</u>, 251 F.3d at 554.  Control person liability under Section 20(a) is contingent upon the plaintiff's ability to prove a primary violation under Section 10(b).  <u>PR Diamonds, Inc. v. Chandler</u>, 364 F.3d

671, 696, 91 Fed. Appx. 418 (6th Cir. 2004).  Dismissal of the control person claims is appropriate where the plaintiff does not establish the primary violation alleged.  Id.

### A. Scienter

The Court will first address whether Plaintiffs have sufficiently alleged the scienter element because it is integral to a claim under Section 10(b) and Rule 10b-5.  In order to determine whether Plaintiffs have sufficiently alleged scienter, the Court must engage in a fact-intensive analysis based on the totality of the circumstances. In re FirstEnergy Corp. Securities Litigation, 316 F.Supp.2d 581, 597 (N.D. Ohio 2004).  In securities fraud claims based on statements of present or historical fact, such as Plaintiffs' claims in this case, scienter can be established by knowledge or recklessness. PR Diamonds, Inc., 364 F.3d at 681.

Plaintiffs are not entitled to all inferences of scienter in their pleading.  Rather, Plaintiffs' allegations of scienter will only survive Defendants' motion if those inferences are both reasonable and strong. Helwig, 251 F.3d at 551.  The Court must balance competing interests and credit to Plaintiffs their inferences only if it appears from all the facts and circumstances that those are the most plausible.  PR Diamonds, Inc., 364 F.3d at 683-84.  Moreover, it is not enough for Plaintiffs to show that Defendants were negligent.  Rather, there must be sufficient allegations of knowing or reckless conduct.  Id. at 686-87.

In securities fraud cases, recklessness is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." Hoffman v.

Comshare, Inc. (In re Comshare Inc. Sec. Litig.), 183 F.3d 542, 550 (6th Cir. 1999) (quoting Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979)). Recklessness under the PSLRA is "a mental state apart from negligence and akin to conscious disregard." Id. "While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." Id. (quoting Mansbach, 592 F.2d at 1025). Thus, the Court must determine whether Plaintiffs have alleged facts sufficient to give rise to a strong inference that, when Defendants made the alleged misrepresentations or materially misleading omissions, they did so with at least a conscious disregard of the falsity of that information.

According to Defendants, Plaintiffs have failed to raise a strong inference of scienter. Plaintiffs assert, however, that they have set forth sufficient allegations in the Complaint to create a strong inference of scienter. Specifically, Plaintiffs allege the following: (1) Diebold had knowledge that their statements about the financial condition of the company were false and misleading; (2) the accounting problems at Diebold were of significant magnitude; (3) the Individual Defendants benefited financially from the allegedly fraudulent scheme; and (4) the misstatements and the disclosure of the alleged fraud occurred in close temporal proximity.

Before addressing each specific allegation, the Court states as an initial matter that Plaintiffs have failed to adequately plead scienter. Plaintiffs have failed to meet their burden of pleading specific facts, which, when viewed cumulatively, persuade the Court that the most plausible conclusion is that Defendants must or should have known about Diebold's problems. "While the allegations no doubt merit drawing some inference of

scienter, that it not enough. The PSLRA requires the [Amended] Complaint to establish a strong inference [of scienter]." <u>PR Diamonds</u>, 364 F.3d at 684. Plaintiffs must show that Defendants "acted at least recklessly, meaning that their states of mind were reflected in highly unreasonable conduct constituting an extreme departure from the standards of ordinary care so obvious that any reasonable person would have known of it." <u>Id</u>. The Amended Complaint fails to meet this heightened burden.

### B. Accounting Irregularities

The primary allegation of scienter found in the Complaint is Plaintiffs' allegation that Diebold had knowledge of the true financial condition of the company, including accounting errors and irregularities. Plaintiffs assert that Diebold violated GAAP as part of their allegedly fraudulent scheme that prematurely recognized revenue in connection with the sale of voting machines and other services. Plaintiffs further allege that the Individual Defendants had extensive knowledge about inflation of the financial results. For example, Plaintiffs point out that the Defendants had access to financial information, including information that revealed the fraudulent revenue recognition scheme. In particular, Plaintiffs allege that Diebold's top executives had access to highly detailed reports that laid out the company's accounting data and met weekly to discuss the company's financial performances and results. (Dkt. # 56 at at ¶ 338, 344, 349). According to Plaintiffs, scienter can be inferred because these facts indicate that Defendants were extremely knowledgeable about Diebold's financial results.

Plaintiffs assert that their allegations that the Individual Defendants had "access to" and "use[d] . . . detailed financial information" establish the required inference that

company managers had fraud in their hearts.   (Dkt. # 62).   Plaintiffs claim these employees received "highly detailed reports" with "accounting data" (citing ¶¶ 338, 342, 344 and 345); that they used "handheld units to track and record service invoices" (citing ¶¶ 338, 346 and 348); and attended  weekly meetings "to discuss the Company's financial performance and results" (citing ¶¶ 338  and 349).   Neither the Complaint nor the opposition, however, explains other than in a conclusory, generalized fashion how those reports or meetings provided the Defendants with specific information revealing "the fraudulent revenue recognition scheme."

Courts have rejected such generalized allegations about receipt of internal reports to establish a strong inference of scienter.

> [I]f a [securities fraud] plaintiff is to rely on the existence of reports  as a means of establishing knowledge, she must include adequate  corroborating details, such as the sources of her information with respect to the reports, how she learned of the reports, who drafted  them, . . . which officers received them, and an adequate  description of their contents[.]

In re Vantive Corp. Secs. Litig., 283 F.3d 1079, 1087-88 (9th Cir. 2002) (citations and internal quotation marks omitted) (no inference of scienter based on defendants' access to information  because "plaintiffs have failed to cite to any specific report, to mention any dates or contents of  reports, or to allege their sources of information about any reports.")

Chief Judge Carr also recognized and applied this approach in Frank v. Dana Corp., No. 3:05 CV 7393, 2007 U.S. Dist. LEXIS 61307, at *19 (N.D. Ohio Aug. 21, 2007), when he rejected the argument that a Reform Act-compliant inference of scienter is established by executives' and directors' "significant contact with the internal reports and data on finances such that they should have been aware the numbers and quotes they

11

were giving were materially false and misleading."  In other words, as Judge Carr stated, "managerial position alone is not sufficient to establish scienter."  Similarly, in In re Ferro Corp. Secs. Litig., Nos. 1:04CV1440, 2007 U.S. Dist. LEXIS 42191, at *46 (N.D. Ohio June 11, 2007), Judge Adams found an insufficient inference of scienter because, among other things, "[a]lthough the [complaint] refers repeatedly to certain 'Monthly Reports,' it is unclear exactly what was in the reports, exactly what statements were made on the same subject, and how the information in the external statements was different from the information in the internal reports."

Therefore, in the absence of specific facts to support an inference of scienter in the Complaint, the Court finds that the generalized allegations of accounting irregularities and Defendants' access to documents does not alone establish scienter.

### C. Confidential Witnesses

Plaintiffs rely on the statements of ten confidential witnesses ("CWs") to support their allegations of scienter.   According to Defendants, the allegations by these CWs do not satisfy the PSLRA's strict pleading requirements because: (1) numerous confidential witnesses left before the start of the Class Period; (2) the descriptions of the confidential witnesses are vague; and (3) the Complaint is lacking in factual particulars that any confidential witness had knowledge regarding exactly what information was known by each individual Defendant.

Plaintiffs, on the other hand, argue that the CWs' statements are reliable and corroborated by independent evidence in the Complaint and other witnesses' accounts. However, "a shared opinion among confidential witnesses does not necessarily indicate

either the falsity or a strong inference of scienter if the allegations themselves are not specific enough." In re Metawave Communs. Corp. Secs. Litig., 298 F.Supp.2d 1056, 1070 (W.D. Wash. 2003) (citation omitted). Moreover, "a shared opinion does not necessarily indicate either the falsity of or a strong inference of scienter if the allegations themselves are based on hearsay, rumor or speculation." Zucco Partners, LLC v. Digimarc Corp., 445 F.Supp.2d 1201, 1208 (D. Oregon 2006).

In the instant case, most of the statements from the CWs do not appear to be based on personal knowledge. Rather, as Defendants note, they refer to "Defendants' scheme" generally or "pressure from corporate." (Dkt. # 56 at ¶ 78, 81, 83, 84, 86, 89, 90). These broad characterizations are similar to the general allegations of a "culture of fear" made by confidential witnesses that were deemed "nothing more than mere speculation" by Judge Adams in In Re Ferro Corp. Sec. Litg., 2007 U.S. Dist. Lexis 42191 (N.D. Ohio June 11, 2007).

Furthermore, as Judge Carr noted, courts have been hesitant to place reliance on an anonymous source when the Supreme Court has required courts to consider all possible motives, and only to recognize scienter if it is "cogent" and "compelling" in the wake of Tellabs. Higginbotham, v. Baxter International Inc., 495 F.3d 753, 2007 U.S. App. LEXIS 17918, 2007 WL 2142298, *2 (7th Cir.) ("It is hard to see how information form anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

The Court concludes, therefore, that the CWs' statements, examined either separately or as a group, do not create a strong inference of scienter.  In order for the statements to evidence scienter, "[t]he Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo."  In re Metawave, 298 F.Supp.2d at 1068.  Here, Plaintiffs rely on numerous statements that there was a "scheme" and "pressure from corporate."  These allegations are not supported by particularized information that details the alleged scheme.  For example, Plaintiffs' fail to provide key data such as details about the CWs' position of employment and how each CW had personal knowledge of the information alleged in the Complaint.  These types of conclusory "he-must-have-known" allegations are routinely rejected by courts as not evidencing scienter.  PR Diamonds, 364 F.3d at 694 (finding that the court would be remiss to infer scienter based on the conclusory allegations that the defendant "must have known" of the alleged fraud); see also Zucco Partners, LLC, 445 F.Supp.2d at 1208 (finding a confidential witness's statements did not demonstrate scienter because the confidential witness did not identify the basis of his knowledge and the allegations were conclusory).

Accordingly, the Court finds that the confidential witness statements do not evidence scienter.  Plaintiff failed to identify sources so as to plead with the particularity required by the PSLRA and Rule 9(b). See In re Keithley Instruments, Inc. Securities Litigation, 268 F.Supp.2d. 887, 899-90 (N.D. Ohio 2002).

14

### D. Helwig Factors

In Helwig, the Sixth Circuit provided guidance as to how much scienter is enough and what allegations satisfy the requirement of a "strong inference."[1]  According to Defendants, the Complaint is devoid of allegations regarding a vast majority of the Helwig factors, and the absence of these factors militates in favor of dismissing the Complaint.  Plaintiffs, on the other hand, argue that at least three of the nine Helwig factors are present in the Complaint.  The Court disagrees with Plaintiffs that three of the nine factors are present.  While the Court recognizes that the Helwig factors are non-exhaustive, Fidel v. Farley, 392 F.3d 220, 233 (6th Cir. 2004), the absence of these factors indicates the absence of scienter.

### *1. Second Factor: Divergence Between Internal Reports and External Statements*

Plaintiffs argue that they meet the second factor because there was a divergence between internal reports and external statements on the same subject.  According to Plaintiffs, such divergence is evidenced by the fact that "top executive officers received highly detailed, financial reports that include, among other accounting data, accounts

---

[1]    These factors are as follows: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission, and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) the existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) the disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and, (9) the self-interested motivation of the defendants in the form of saving their salaries or jobs.  Helwig, 251 F.3d at 552 (citation omitted).

15

receivable and amounts outstanding for past due payments" and "scorecards" which "set forth highly detailed accounting information about the Company, including the Company's accounts receivable, [Days Sales Outstanding], as well as average dollars sales and total value of sales revenue for the week." (Dkt. # 56 at ¶ 343-345).

Plaintiffs' allegations regarding the second factor, however, are conclusory and fail to specifically allege where there was a divergence between internal reports and external reports on the same subject. Plaintiffs merely allege that there were reports, but the Complaint never indicates any particular reports or documents to which these allegations refer. Accordingly, Plaintiffs' allegations showing a supposed material divergence between Diebold's unidentified internal reports and external statements do not satisfy the PSLRA's pleading requirements because the allegations are not specific. See PR Diamonds, Inc., 364 F.3d at 692 (finding "no specific allegations of a divergence between internal reports and external statements on the same subject.").

### 2. *Third Factor: Closeness in Time*

Plaintiffs argue that this factor is present because there is closeness in time between an allegedly fraudulent statement and a later disclosure. Specifically, Plaintiffs point to the August 12, 2005, amended Form 10-Q (which included both earnings and income that were overstated) and an amended Form 10-K. In both those filings, Diebold stated that "its disclosure controls and procedures are effective." Just three days later, however, the Company filed its Form 10-Q for the second quarter of 2005, acknowledging that its "disclosure controls and procedures are not effective." (Dkt. # 56 at ¶ 100). The Court agrees with Plaintiffs that the proximity in time between Defendants

16

last statement and the disclosures of inconsistent information generally, weighs in favor of a finding of scienter.  But, even assuming the later disclosure was totally inconsistent and that the three months time period was close enough in temporal proximity to weigh in favor of a finding of scienter, this is just one factor out of many that the Court must analyze.  FirstEnergy, 316 F.Supp.2d at 597 (noting that the court must analyze the totality of the circumstances in securities fraud cases).

### 3. Ninth Factor: Insider Trading

Plaintiffs also argue that they have adequately plead scienter because of the allegations that Defendants had both motive to commit securities fraud and ample opportunity to do so.  While facts showing motive and opportunity may be relevant to establishing the inference of scienter, Helwig, 251 F.3d at 550, a plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000).  Here, Plaintiffs allege that Individual Defendants O'Dell, Swidarski, Krakora, Crowther, and Bucci sold 40,000 shares of Diebold stock for proceeds of approximately $3 million two weeks after reporting inflated revenues and earnings in its 2004 financial statements.  (Dkt. # 56 at ¶ 228, 339).

The Sixth Circuit has held that insider sales at "unusual or suspicious" levels is probative of motive.  Hoffman v. Comshare, 183 F.3d 542, 553 (Sixth Cir. 1999). In other words, courts "consider a plaintiff's allegations that the individual defendants engaged in insider trading to be a motive to commit fraud. By trading on inside information, executives stand to profit from what may turn out to be other shareholders'

17

losses." In re Cardinal Health, Inc. Sec. Litigs., 426 F.Supp.2d 688, 727 (S.D. Ohio 2006).

The only thing even arguably "suspicious" about the sale of this stock, however, is that it was sold during the class period. Plaintiffs plead no other facts that are probative of motive. It is not enough to merely plead insider trading "without regard to either context or the strength of the inferences to be drawn . . . . At a minimum, the trading must be in a context where defendants have incentives to withhold material non-public information, and it must be unusual, well-beyond the normal patterns of trading by those defendants." Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999) (citations omitted). The mere sale of stock is not enough to lead the Court to infer scienter. See generally In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999) (finding no inference of scienter where three of the five individual defendants sold no stock during the class period and those who did sold only a small percentage of their stock).

Furthermore, although there is no "bright line" test to determine whether a defendant's sale of his or her stock is "suspicious," courts routinely analyze the sale of stock by applying the following three factors: (1) whether the alleged trades were "normal or routine" for that particular insider; (2) whether the profits reaped were substantial enough in relation to the insider's compensation level so as to produce a suspicion that the insider might have had an incentive to commit fraud; and (3) whether in light of the insider's total stock holdings, the sales were unusual or suspicious. Cardinal Health, 426 F.Supp.2d at 728.

With respect to the first factor, the Court cannot conduct a meaningful analysis because the Complaint offers no information about the Defendants' stock transactions either before or after the Class Period.  In other words, the Court has no idea whether the alleged trades were "normal or routine."  Similarly, the Complaint lacks information that gives context to the Defendants' total compensation for the time frame in which the alleged insider trading occurred.  Accordingly, these pleading deficiencies prevent the Court from truly assessing whether Defendants' sales were unusual. <u>Greebel</u>, 194 F.3d at 198.

With respect to the third factor, Defendants provide information that the Individual Defendants kept the great majority of their shares, and retained even more Diebold stock during the class period.  (Dkt. # 59).  As Defendants point out, retaining a bulk of formerly-restricted shares during the class period in question is inconsistent with an inference of scienter.  <u>See</u> <u>In Re Century Bus. Servs. Sec. Litig</u> 2002 WL 322545113, at * 8.  Plaintiffs' allegations of insider trading, therefore, do not raise a strong inference of scienter.

**E. Enormity of Fraud**

Plaintiffs argue that the magnitude of the fraud supports an inference of scienter. In the Sixth Circuit, however, the magnitude of the financial fraud is not a factor in determining defendants' scienter.  <u>Fidel v. Farley</u>, 392 F.3d 220, 231 (6th Cir. 2004) ("Allowing an inference of scienter based on the magnitude of fraud would eviscerate the principle that accounting errors alone cannot justify a finding of scienter…. It would also

19

allow the court to engage in speculation and hindsight, both of which are counter to the PSLRA's mandates.).

### F. Evaluation of All Factors

The Court, ultimately, must evaluate all these factors together and ask: "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Tellabs, 127 S.Ct. at 2511.  Plaintiffs assert that various Defendants had access to various documents that would have informed them of Diebold's financial difficulties, but cite no specific basis for such knowledge.  Ultimately, an assessment of all the factors, coupled with the absence of specific facts to support otherwise conclusory allegations, persuades the Court that Plaintiffs have failed adequately to allege scienter. In other words, dismissal is appropriate because Plaintiffs have failed to allege "facts giving rise to a strong inference that [Defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2).  As the Court has determined that Plaintiffs have failed to properly allege scienter, it is not necessary to analyze the other requirements of their claim under Rule 10(b)(5).

## IV. SECTION 20(a) CLAIM

Plaintiffs also allege that Defendants O'Dell, Geswein, Krakora, Swidarksi, Evans, Crowther, Urosevich, Bucci and Hillock were "control persons" of Dieibold the meaning of § 20(a) of the Exchange Act, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable,

20

unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

For a § 20(a) claim, a plaintiff must establish (1) that the "controlled person" committed an underlying violation for the securities laws or rules and regulations promulgated thereunder, and (2) that the "controlling person" defendant in a Section 20(a) claim directly or indirectly controlled the person liable for the securities law violation. PR Diamonds, Inc., 364 F.3d at 697.

First, Diebold or its employees must have violated securities laws. Id. This most basic element of the test is not met. As Plaintiffs' claim that the directors violated § 10(b) of the Exchange Act fails, there is no remaining underlying violation on which to base a § 20(a) claim. Plaintiffs do not sufficiently plead a violation of securities law by Diebold, its employees, or the individual defendants. Whether Defendants acted as controlling persons with "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person," which they largely did through their positions as directors, this control is not sufficient to establish liability as there is no pled and established underlying violation. 17 C.F.R. § 240.12b-2.

Furthermore, even if Plaintiffs can establish that the directors controlled individuals who themselves could be proven to have knowingly and willingly violated the Exchange Act, Plaintiffs have not proven the requisite state of mind to hold the directors liable for any underlying actions necessary to establish a § 20(a) claim. Plaintiffs argue that by virtue of their positions as controlling persons, the Individual Defendants are

liable under § 20(a).  Plaintiffs have failed previously to show scienter, and cannot establish the Individual Defendants were not acting in good faith, nor that they induced the fraud.  Plaintiffs' § 20(a) claim fails.

## V. CONCLUSION

For the foregoing reasons, it is hereby ordered that Defendants' Motion to Dismiss is **GRANTED**.  (Dkt. # 58).

**/s/ Peter C. Economus – August 22, 2008**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**